**ELCOR CHEMICAL CORPORATION,**
Appellant,

v.

**AGRI–SUL, INC., et al., Appellees.**

No. 18064.

Court of Civil Appeals of Texas, Dallas.

March 29, 1973.

Rehearing Denied May 3, 1973.

Stuart G. Johnston, Jr., Dallas, Milton Bankston, F. H. Pannill, Stubbeman, McRae, Sealy, Laughlin & Browder, Austin, for appellant.

Jay M. Vogelson, Steinberg, Generes, Luerssen & Vogelson, W. Newton Barnes, Dallas, for appellees.

CLAUDE WILLIAMS, Chief Justice.

This is a "trade secret" case. Elcor Chemical Corporation (hereinafter referred to as ELCOR) instituted this action against Ronald J. Miller, Donald C. Kruse and Glenn Watts, former employees of ELCOR, seeking to enjoin them from using or disclosing confidential information and trade secrets relating to a process for the manufacture of a sulphur fertilizer

product which plaintiff alleged had been acquired by the three named defendants while they were in the employ of ELCOR and under express contractual obligations not to reveal such trade secrets. ELCOR also alleged that, with the aid and financial backing of Caldwell Computer Corporation Miller, Kruse and Watts had created a corporation known as Agri-Sul, Inc. and that such newly formed corporation was engaged in the manufacture and sale of sulphur fertilizer, the chemical composition thereof being information acquired by Miller, Kruse and Watts while employed by ELCOR and used by them in contravention of their contractual obligation not to reveal such information to others. Based upon its allegations of breach of employment agreements, failure to reveal an important discovery, violation of the fiduciary duty by disclosure of confidential information and trade secrets to an outsider, violation of noncompetitive agreements, and conspiracy to violate the provisions of the employment agreements, ELCOR sought injunctive relief as well as extensive monetary damages.

The case was submitted to the court without a jury. We submit the following summarization of material facts.

ELCOR is a publicly held conglomerate composed of many and diverse operating subsidiaries. Among its businesses was sulphur mining, process and sales. In 1967 its manufacturing plant located at Lehman, Texas was moved to Dimmitt, Texas. This plant primarily produced anhydrous ammonia and thiovite, a liquid fertilizer product and also a dry sulphur fertilizer which bore the name "Sol-U-Sul". Miller was employed by ELCOR from May 10, 1963 to December 15, 1969 and was plant manager of the Sol-U-Sul operation, Kruse, a chemical engineer, was employed by ELCOR at the Dimmitt plant from April 20, 1967 to October 15, 1969. Watts, a salesman, was employed by ELCOR from November 11, 1963 to December 15, 1969. Miller, Kruse and Watts, as employees of ELCOR, had each executed written employment agreements containing the following relevant provisions:

"For and in consideration of, and as part of the terms of my employment by ELCOR, at a wage or salary and for such length of time as such employment shall continue, I agree:

1. With respect to INVENTIONS made or conceived by me, either solely or jointly with others, during (i) my employment by Elcor or (ii) within one year after the termination of my employment if such invention is based in whole or in part on CONFIDENTIAL INFORMATION:

a. To promptly and fully inform the President or Executive Vice President of ELCOR CHEMICAL CORPORATION, or such person as the President or Executive Vice President may designate, in writing, of such INVENTIONS.

b. To assign (and I do hereby assign) to ELCOR all of my rights to such inventions and Applications for Letters Patent and to Letters Patent granted upon such INVENTIONS.

\*　　\*　　\*　　\*　　\*　　\*

2. Except as required in my duties to ELCOR, I will not use or disclose any CONFIDENTIAL INFORMATION either during or after my employment by ELCOR.

3. Upon termination of my employment with ELCOR, all records of CONFIDENTIAL INFORMATION, including copies and models thereof in my possession, whether prepared by me or others, will be left with ELCOR."

The contract also provided:

"5. For a period of two years after termination of my employment by ELCOR;

a. If I am now or hereafter employed by ELCOR in a sales capacity (the term sales capacity shall include only jobs which are directly related to the sale of

ELCOR's products), I will not render services, directly or indirectly, to any CONFLICTING ORGANIZATION in connection with the sale, merchandising or promotion of CONFLICTING PRODUCTS to any customer of ELCOR upon whom I have called, or whose account I have supervised on behalf of ELCOR, at any time during the last two years of my employment by ELCOR.

b. I will not render services, directly or indirectly to any CONFLICTING ORGANIZATION which is producing or engaged in research with regard to any RESTRICTED MATTER."

The contract contained the following definition of terms:

"B. CONFIDENTIAL INFORMATION means information not generally known about Elcor's processes and products, including information relating to research, plans, development, techniques, manufacture, projects, purchasing, accounting, financing, engineering, marketing, merchandising and selling including, without limitation, information set out in writing, pictures, drawings and information that is not reduced to written form.

C. CONFLICTING PRODUCT means any product or process of any person or organization other than ELCOR, in existence or under development, which resembles or competes with a product or process upon which the employee may work during the last two years of his employment by ELCOR, or about which the employee may acquire CONFIDENTIAL INFORMATION through his work with ELCOR.

D. INVENTIONS means discoveries, improvements and ideas (whether patentable or not) relating to any activities of ELCOR.

E. CONFLICTING ORGANIZATION means any person or organization which is engaged in, or about to become engaged in, research on or development, production, marketing, or selling of a CONFLICTING PRODUCT.

F. RESTRICTED MATTER means any product or process which ELCOR and I may hereafter so designate by written agreement."

William J. Haggard, assistant to the executive vice president of ELCOR, who held scientific and engineering degrees, testified in detail concerning the extensive research and development which went into the production of ELCOR products. He said that as a part of the extensive sulphur activities of ELCOR the company made a decision in 1967 to develop a sulphur fertilizer product that would more readily break down in the soil. The company's efforts, including those contributed by Miller and Kruse, resulted in a product called "Sol-U-Sul". This product resulted from the addition of clay to sulphur "prills" permitting them to break down into finer particles. It was determined that another manufacturing process would have to be devised which would result in a more readily degradable product. Accordingly, numerous tests and experiments were attempted in an effort to arrive at a proper manufacturing process. During this experimentation in late 1968 another technique was evolved for manufacture of a product called "Improved Sol-U-Sul". This process involved pouring the molten sulphur on two pads and permitting it to solidify and thereafter running it through a crusher in such a manner that the oversized particles were again crushed as as to produce the particle size required for commercial agricultural fertilizer. Haggard testified that this process was original with ELCOR and to his knowledge no one else used it and that it was the product of extensive laboratory testing. Six ELCOR employees, in addition to the defendants Miller and Kruse, participated in this research.

The testimony of Haggard, together with that of other witnesses, reveals that the test and experimentation conducted by ELCOR and its employees involved two dif-

ferent formulas for mixing sulphur fertilizer:

(1) 88 per cent sulphur and a 12 per cent mixture of bentonite clay and attapulgite clay;

(2) 90 per cent sulphur and a 10 per cent bentonite clay.

The record also discloses that there have been two different manufacturing processes involving these formulas:

(a) The "prilling" formula, which is a process of running the molten sulphur through something resembling a sieve so that droplets of molten sulphur are immersed in water and solidified;

(b) A crushing process whereby the molten sulphur is poured onto a slab, allowed to cool and solidify, and then crushed and screened to the required size by a mechanical means.

Thus, a manufacturer could use formula 1/method a, formula 1/method b, formula 2/method a, or formula 2/method b. The basic ELCOR product, Sol-U-Sul, was composed of formula 1, and the manufacturing method used was method a, the "prilling" method. Improved Sol-U-Sul was also formula 1 but the manufacturing method was b. This product was discontinued in the spring of 1969 by ELCOR due to the economics of the crushing process. The other formula, 90 per cent sulphur —10 per cent bentonite clay, had also been used by ELCOR but unsuccessfully tried with the prilling or (a) process.

In the spring of 1969 Miller testified that he and Kruse, with full knowledge and realization of the need for a high analysis sulphur in the agricultural industry, began working in his garage experimenting with the 90–10 mixture with a crushing process. They discovered that when the formula consisting of the sulphur and clay in "90–10" form, was subjected to the crushing process rather than the prilling process, the constituents would degrade satisfactorily. Miller and Kruse immedi-

ately recognized the market potential for this product that they had developed, and they began discussions about going into the sulphur fertilizer business. It is uncontroverted that neither Miller nor Kruse reported their "discovery" to the ELCOR officials though they were both employed by ELCOR and under contractual obligation to turn over any new process concerning the fertilizer business to their employer.

After deciding to go into business for themselves and to utilize the improved method, Miller and Kruse decided that Mineola, in East Texas, would be a good location for a fertilizer plant. Being unsuccessful in obtaining a Small Business Administration loan from several lending institutions in Mineola, Miller talked to Watts who recommended that he contact a brother-in-law, Bob Caldwell, who was president of the Caldwell Computer Corporation in Dallas. In September of 1969 Kruse and Miller had a meeting with Caldwell in Dallas discuss possible financing of their business venture. The two men, still ELCOR employees, took along a sample of the product that they had developed in Kruse's garage, displayed its degradability in water, explained its market potential, and outlined its cost of production. They also demonstrated to Caldwell certain trade publications and articles discussing the sulphur formula for their fertilizer and describing the "crushing" process they proposed to utilize. Out of this meeting came an agreement whereby Caldwell Computer Corporation would advance the sum of $117,000 in exchange for 80 per cent ownership of stock in the new business. Miller and Kruse would receive the remaining 20 per cent of the stock. Miller testified that Caldwell's attorneys examined their employment contract with ELCOR and expressed their opinion that there was "little chance for exposure".

On December 5, 1969 Agri-Sul, Inc. was incorporated for the purpose of producing this "crushed" fertilizer product. Caldwell was made president of the corporation. On December 8, 1969 the first organiza-

tional meeting of the Agri-Sul, Inc. board of directors was held with Miller, Kruse and Caldwell in attendance. Kruse, in the meantime, had resigned his post with EL-COR on October 15, 1969, and immediately began preparations for the Mineola plant by making equipment purchases. Kruse worked out of the Caldwell offices in Dallas and several items were acquired on Caldwell purchase order forms. The evidence also reveals that much of the equipment in the Agri-Sul plant in Mineola was the same or similar to that utilized at EL-COR's Dimmitt plant during the "Improved Sol-U-Sul" experimentation. Miller resigned from ELCOR on December 15, 1969 and shortly thereafter joined Kruse in Mineola where by this time the plant was approximately 50 per cent completed. Agri-Sul began operations on February 1, 1970 and its product "Agri-Sul" hit the fertilizer market around March 1, 1970. Watts resigned from ELCOR on December 15, 1969 and became employed by Agri-Sul, Inc. around January 1, 1970. He testified that while employed by ELCOR he did not sell Sol-U-Sul, but that his sales were confined to ELCOR's liquid fertilizer product and ammonia product. Watts said that while employed by Agri-Sul he sold to wholesale accounts and that during his tenure at ELCOR he had sold to farmers on a retail basis. Watts admitted that he presently made calls to former Sol-U-Sul buyers, but stated that he had never contacted these customers personally while at EL-COR. There is some evidence, however, that Watts, while still an employee of EL-COR, may have left some Agri-Sul samples with two or three ELCOR customers who have since become regular Agri-Sul buyers.

Watts, Kruse and Miller all testified that one of the reasons they left the Dimmitt plant was that ELCOR was having serious financial difficulties and was beginning to let some employees leave. According to Kruse things were beginning to look "pretty grim", and it was common knowledge that the Dimmitt plant had been offered for sale. At some point in 1970 ELCOR

ceased its Sol-U-Sul production and sold some of its facilities in Dimmitt. It also appears from the record that ELCOR, in July of 1971, was involved in reorganization plans under the federal bankruptcy laws.

Miller testified that upon resigning at ELCOR he told his supervisor that he was going into business for himself, but that he didn't tell him exactly what he was going to be doing because, "I didn't want to rock the boat, so to speak, at that time * * *. I felt sure that there would be repercussions from Elcor because of the employment contract, even though I felt * * * there was no violation to speak of * * *. At that point in time, I didn't want to go though a hassle with Elcor over this." He admitted that his experience with degradable sulphur had come through his association with ELCOR, and that the idea in regard to the crushed product was "born of experience and while employed by Elcor." Kruse also admitted that everything he knew about the applicability of sulphur to fertilizer came from his experience at the Dimmitt plant while an ELCOR employee. It is uncontroverted that Agri-Sul and Sol-U-Sul are "conflicting products", and that they did, in fact, compete for a few months during 1970. Miller and Kruse took the position that there were physical and chemical differences between the two products. They pointed out that Agri-Sul had a higher sulphur analysis, and that it contained only one inert clay substance, and that it degraded much faster and more readily than Sol-U-Sul. They testified that there was nothing unique about their product or the "crushing" process and that the information used by them was generally known in the trade.

At the time of the trial of this case in March of 1972 the evidence shows that Miller and Kruse were no longer employees of Agri-Sul, Inc. but they were still owners of stock in the corporation. Watts was still employed as a salesman for Agri-Sul. The testimony concerning the

amount of damages alleged to have been sustained by ELCOR is somewhat sketchy. Caldwell testified at the trial that Agri-Sul had made a profit of $40,000 for the first nine months of 1971 but there was also evidence that Agri-Sul, Inc. lost $97,000 during 1970. ELCOR also introduced evidence that its Sol-U-Sul process was worth some $397,000 because it had expended that amount for research and development of the product.

The following findings of fact were made by the trial court, as a part of the judgment: that Miller, Kruse and Watts, as employees of ELCOR, had executed the agreements prohibiting each of them from disclosing information about ELCOR's process and products, including Sol-U-Sul and Improved Sol-U-Sul; that said agreements were reasonable; that the formulas and processes pertaining to the two sulphur products, Sol-U-Sul and Improved Sol-U-Sul, were trade secrets of ELCOR; that with full knowledge of the employee agreements of Miller, Kruse and Watts, Caldwell had induced said employees to resign from ELCOR and to accept employment with Agri-Sul, Inc.; the business of Agri-Sul, Inc. was to produce a product of substantially the same in formula as Improved Sol-U-Sul, which resembled and competed with same in the sales market; the process of manufacture of Agri-Sul was the same as developed by ELCOR for the manufacture of Improved Sol-U-Sul; that all of the information and knowledge Agri-Sul and Caldwell had pertaining to any sulphur products came from the knowledge of Miller, Kruse and Watts while in the employ of ELCOR; that Miller, Kruse and Watts disclosed to Agri-Sul and Caldwell confidential information obtained by them with reference to the Sol-U-Sul and Improved Sol-U-Sul process during the time of their employment by ELCOR; that Miller, Kruse and Watts violated their fiduciary relationship as employees of ELCOR by their acts of disclosure of trade secrets and information of ELCOR to Agri-Sul and Caldwell; that Caldwell induced and enticed Miller, Kruse and Watts to breach their contracts of employee agreements with ELCOR; that Caldwell, Agri-Sul, Miller, Kruse and Watts acted in concert in derogation of the contractual and fiduciary relationships due ELCOR, intentionally and willfully.

The court then decreed that ELCOR do have and recover judgment against Agri-Sul, Caldwell, Miller, Kruse and Watts, jointly and severally, in the sum of $15,000.

The injunctive feature of the judgment was as follows:

"IT IS FURTHER ORDERED, ADJUDGED and DECREED by the Court that Agri-Sul, Inc., Caldwell Computer Company, Ronald J. Miller, Donald C. Kruse and Glenn Watts be and they are herewith permanently enjoined from imparting to any other person, firm or corporation the materials, tests or production information used and employed by Elcor Chemical Corporation during the time Ronald J. Miller, Donald C. Kruse and Glenn Watts were employed by Elcor Chemical Corporation. This injunction does not prohibit or preclude in any way the continued employment and use by Agri-Sul, Inc., of its production technique as now constituted."

Appellant ELCOR, in two points of error, attacks the judgment (1) because it fails and refuses to provide adequate relief by way of injunction and damages for breach of non-disclosure provisions of the employment contracts; and (2) because it does not award adequate relief by way of injunction and damages for breach of the non-competitive provisions of the employment contracts.

Appellees, by cross-points of error, attack the trial court's judgment contending that the court should have exercised its discretion by denying injunctive relief entirely and by denying any money damage.

Concerning the injunctive feature of the judgment rendered it is the primary thrust of appellant's argument that while the trial

court was correct in finding the existence of a trade secret and the fact that Miller, Kruse and Watts had violated their contractual obligation to ELCOR not to reveal such trade secret and had, with the benefit of Caldwell's financial aid and encouragement, gone into a competing business known as Agri-Sul, the trial court's injunction was too limited in its scope in that it should have perpetually enjoined all of the appellees from utilizing the trade secret at any time following the decree. Appellant argues that the injunction as rendered has the effect of completely taking away and destroying the equitable rights to which they were entitled. Appellant takes the position that the first part of the decree relating to injunction which prohibits *further* disclosure to other persons is utterly useless to it as a protective device because by virtue of *past* disclosures there has already been set up a competing entity in the form of Agri-Sul which has pre-empted the sulphur fertilizer market by utilizing the newly discovered variation of the Improved Sol-U-Sul technique. Appellant argues that the practical effect of the last sentence in the injunctive portion of the judgment is to protect Agri-Sul from further competition and to allow them to enjoy the fruits of their wrongdoing by continuing to use the Agri-Sul process.

■ A careful review and analysis of the entire record in this case convinces us that appellant ELCOR is correct in its position concerning the injunctive relief to which it was equitably entitled to the end that its rights to the trade secret could be protected. We are also convinced, and so hold, that the record contains ample evidence of probative force to support the trial court's findings of fact that the processes developed by Miller and Kruse while employees of ELCOR were trade secrets. While there seems to be no universally accepted definition of the term "trade secret" a commonly accepted definition is that found in Restatement of Torts, § 757 (1939):

"A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula or a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers * * *."

■ Concerning liability for disclosure of trade secrets the same text continues:

"One is liable for disclosure of trade secrets if (a) he discovers the secret by improper means, or (b) his disclosure or use constitutes a breach of confidence reposed in him by the other in disclosing the secret to him."

Again, in 55 Tex.Jur.2d, "Trademarks, Trade Names, Etc.", § 48, p. 682, it is said:

"A trade secret is a property right that will be protected as against those who, through breach of trust or violated confidence, attempt to apply the secret to their own use."

Concerning the use of the term "property" as related to trade secrets, Mr. Justice Holmes of the United States Supreme Court in E. I. DuPont de Nemours Powder Co. v. Masland, 244 U.S. 100, 37 S.Ct. 575, 61 L.Ed. 1016 (1917), says:

"The word 'property' as applied to trademarks and trade secrets is an unanalyzed expression of certain secondary consequences of the primary fact that the law makes some rudimentary requirements of good faith. Whether the plaintiffs have any valuable secret or not the defendant knows the facts, whatever they are, through a special confidence that he accepted. The property may be denied, but the confidence cannot be. Therefore the starting point for the present matter is not property or due process of law, but that the defendant stood in confidential relations with the plaintiffs, or one of them. These have

given place to hostility, and the first thing to be made sure of is that the defendant shall not fraudulently abuse the trust reposed in him. It is the usual incident of confidential relations. If there is any disadvantage in the fact that he knew the plaintiffs' secrets, he must take the burden with the good."

■ Our Supreme Court in two landmark cases, Hyde Corporation v. Huffines, 158 Tex. 566, 314 S.W.2d 763 (1958) and K & G Oil Tool & Service Co., Inc. v. G & G Fishing Tool Service, 158 Tex. 594, 314 S.W.2d 782 (1958), has had occasion to reiterate the well established rule of law that when one breaches his confidential relationship in order to unfairly use a trade secret of another, equity will grant relief in the form of monetary damages as well as injunction to restrain the use of such secret.

To the same effect see Furr's, Inc. v. United Specialty Advertising Co., 385 S. W.2d 456 (Tex.Civ.App., El Paso 1964); Julius Hyman & Co. v. Velsicol Corporation, 123 Colo. 563, 233 P.2d 977 (1951); Water Services, Inc. v. Tesco Chemicals, Inc., 410 F.2d 163 (5th Cir. 1969); 170 A. L.R. 471; 43 C.J.S. "Injunctions" § 148, et seq., p. 750.

■■ The equitable cloak of protection must, of necessity, be full and complete so that those who have acted wrongfully and have breached their fiduciary relationship, as well as those who willfully and knowingly have aided them in doing so, will be effectively denied the benefits and profits flowing from the wrongdoing. Full and complete protection must be given against breach of faith and reprehensible means of learning another's secret. The record in this case is clear and convincing that Miller and Kruse, while being paid by ELCOR and while under a solemn written obligation, breached their fiduciary relationship with ELCOR by developing a process for fertilizer manufacturing, in the secret confines of Miller's garage, and, with full knowledge of the value of such process so

developed they deliberately withheld such knowledge from their employer. Possessed with this valuable information they, with the aid of Watts and with the financial assistance of Caldwell, created a new corporation and began doing business utilizing the very trade secrets which rightfully belonged to ELCOR. This action called for equitable protection but the trial court's decree, as worded, wholly failed to extend to ELCOR the relief which was essential to frustrating and defeating the results of the wrongful acts on the part of all appellees. Instead, the decree, while acknowledging the necessity of equitable relief, really deprives ELCOR of the right to legal restraint against continued use by Caldwell, Agri-Sul, Miller, Kruse and Watts, of the secret process rightfully owned by ELCOR.

■ Appellees seek to evade their contractual obligation and duty flowing from fiduciary relationship with ELCOR by taking the position that the knowledge utilized by them in the development of the Agri-Sul process was not really a secret but was something that could have been obtained by reading articles and trade magazines, etc. The same contention was advanced in Hyde Corporation v. Huffines, 158 Tex. 566, 314 S.W.2d 763 (Tex.Sup.1958) and K & G Oil Tool & Service Co., Inc. v. G & G Fishing Tool Service, 158 Tex. 594, 314 S.W.2d 782 (1958) and many other cases such as Conmar Products Corp. v. Universal Slide Fastener, 172 F.2d 150 (2d Cir. 1949); Adolph Gottscho, Inc. v. American Marking Corp., 18 N.J. 467, 114 A.2d 438 (1955); Franke v. Wiltschek, 209 F.2d 493 (2d Cir. 1953); and the recent case of Ventura Mfg. Co. v. Locke, 454 S.W.2d 431 (Tex.Civ.App., San Antonio 1970). See also 38 A.L.R.3d 572 (1971) and cases there cited. In each of these cases the court rejected the argument now advanced by appellees by pointing out that whereas information could have been obtained from other sources the point is that such was not done. This knowledge was a product of their work, the combination of appara-

tus and equipment, materials and procedures which made up the trade secret that should have been protected by virtue of the confidential relationship between the parties. The same analysis applies to the facts of this case. It must be borne in mind and reiterated that the Agri-Sul process is not a patent but a trade secret. The essence of ELCOR's action is not infringement but the breach of obligation of good faith imposed by contract. It does not matter that Miller and Kruse could have gained their knowledge from a study of books and magazines. The fact is that they did not do so. Instead, they gained this knowledge from ELCOR by way of their confidential relationship and in so doing they incurred a duty not to use it to ELCOR's detriment. This duty was breached by them and because of this breach, we are compelled by equity to extend to ELCOR adequate injunctive relief.

█ We are not impressed with appellees' argument to the effect that there is some evidence in the record that ELCOR has ceased to do business or to use the fertilizer process and for those reasons ELCOR is not entitled to injunctive relief against the continued use of the trade secret by appellees. The same argument was advanced in Harris Manufacturing Co. v. Williams, 157 F.Supp. 779 (W.D.Ark. 1957), and was rejected by the court. The court said that the mere fact that the injured party was not utilizing the information at the present time does not prevent same from being a trade secret and does not give the wrongdoers the liberty of appropriating and using said secret for their profit and gain. The court pointed out that the trade secret is available for the owner's use at any time it desires to do so and its failure to use the process at the present time does not militate against its right to have the wrongdoers enjoined from copying said process and violating the owner's trade secret. We agree with the rationale of this case and think it is applicable to the instant case. Whatever may be the present legal status of ELCOR

it still is the owner of the trade secret appropriated by appellees for their use and benefit. The law cannot sanction this action on the part of appellees merely because the owner does not presently exercise its right to utilize the process.

We conclude, therefore, from what we have said and based upon the authorities cited that the trial court failed to extend to ELCOR adequate injunctive relief against appellees and that such injunction should be enlarged to perpetually enjoin appellees, and each of them, from continuing to utilize the trade secret acquired by appellees from ELCOR.

█ We agree with appellees that the trial court properly recognized that ELCOR's claim with regard to the "non-competition" provision of the employment contract with Watts is now moot and judgment was properly rendered for Watts on that phase of the case. The employment agreement, copied above, restricts the time for non-competition on the part of the employee to a period of two years following termination of employment. Miller, Kruse and Watts terminated their employment with ELCOR at the end of 1969. The two-year period has expired as to each of the former employees and Miller and Kruse were not employed by Agri-Sul at the time of the trial. Weatherford Oil Tool Co. v. Campbell, 161 Tex. 310, 340 S. W.2d 950 (1960).

█ We now turn to a consideration of that part of the trial court's decree awarding money damages to ELCOR in the sum of $15,000. Appellant ELCOR argues that by reason of confidential and contractual breach of duty by appellees in utilizing for their own profit the trade secret acquired from ELCOR that ELCOR is entitled not only to injunctive relief but adequate damages. Appellant contends that the trial court picked the figure $15,000 "out of thin air" and that this court should render a money judgment against appellees in favor of ELCOR for at least $500,000.

Appellant relies upon such cases as Vitro Corporation of America v. Hall Chemical Co., 292 F.2d 678 (6th Cir. 1961); Servo Corporation of America v. General Electric Co., 393 F.2d 551 (4th Cir. 1968); and Julius Hyman & Co. v. Velsicol Corporation, 123 Colo. 563, 233 P.2d 977 (1951), as holding that reasonable royalty on sales of the defaulting fiduciary, cost of research and development to ELCOR, profits lost by ELCOR by not having the trade secret, and profits obtained by Agri-Sul, Inc., made at the benefit of ELCOR are proper elements of damages in a case involving the wrongful use of a trade secret. While we are in complete accord with the cases cited, a careful review of this record convinces us that appellant ELCOR has wholly failed to assume and discharge its burden of producing satisfactory evidence to support a lawful money judgment against appellees. There is evidence that ELCOR "has expended in excess of $397,000 in research and development" on sulphur fertilizer, but no testimony was offered describing what the actual costs were, and whether those costs related to the prilling process exclusively or included some costs with regard to the crushing process, or related to something entirely different. There is no way for the trial court or this court to determine the actual costs expended by ELCOR that would properly be chargeable to the secret process with which we are now concerned. The only other evidence relating to damages is that Agri-Sul made a profit of $40,000 for the first nine months in 1971. However, the same testimony reveals that Agri-Sul lost $90,000 during its first year in business. No evidence was offered by ELCOR describing or demonstrating what actual profits would have been made by ELCOR had it been in possession of the process nor is any evidence offered to show the actual profit made by Agri-Sul. In this state of the record we agree with both appellant and appellees that there is no evidence to support the trial court's award of $15,000. Moreover, the record before us is such that we cannot make an award of any damages ourselves.

Accordingly, the trial court's judgment awarding $15,000 to ELCOR must be reversed and judgment here rendered that ELCOR recover no money damages against appellees.

The judgment of the trial court is affirmed in part and in part reversed and judgment rendered, as follows:

(1) That part of the trial court's decree denying ELCOR injunctive relief against appellees for violating the "non-competition" provision of the employment agreements is affirmed;

(2) That part of the trial court's decree awarding $15,000 money damages to ELCOR is reversed and judgment here rendered that ELCOR do have and recover no money damages from appellees; and

(3) That part of the trial court's decree rendering injunctive relief is reversed and judgment here rendered as follows:

It is ordered, adjudged and decreed that Agri-Sul, Inc., Caldwell Computer Company, Ronald J. Miller, Donald C. Kruse and Glenn Watts be and each of them is hereby permanently enjoined from using or continuing to use the secret process relating to the production of sulphur fertilizer which had been developed by Miller and Kruse while employees of ELCOR; that Agri-Sul, Inc. be permanently enjoined from using or continuing to use its production technique as now constituted. It is further ordered, adjudged and decreed by the court that all of appellees, jointly and severally, are permanently enjoined from imparting to any other person, firm or corporation the materials, tests or production information used and employed by ELCOR Chemical Corporation during the time Miller, Kruse and Watts were employed by such company.

(4) All costs of this appeal are assessed against appellees, jointly and severally.

Affirmed in part and reversed and rendered in part.