John O. BERTOTTI, Pact Wire, Inc.
and Houston Engineered Products
Corporation, Appellants,

v.

C.E. SHEPHERD CO., INC., Appellee.

No. C14–87–000057–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

May 26, 1988.

Rehearing Denied June 23, 1988.

Donald H. Fidler, Michael A. Gaitz, Houston, for appellants.

Ronald E. Tigner, Kathleen M. Carver, Janet A. Nussbaum, Houston, for appellee.

Before SEARS, DRAUGHN and CANNON, JJ.

## OPINION

SEARS, Justice.

This is an appeal from a temporary injunction ordering appellants not to compete with appellee in accordance with an employment agreement signed by appellant Bertotti. We find the injunction to be overbroad in its prohibition on sales of goods or materials of *any* kind to customers of C.E. Shepherd Co., Inc. We modify the injunction and affirm the injunction as modified.

Appellee C.E. Shepherd Co., Inc. (Shepherd) manufactures and sells wire and plastic products that are used in the poultry and commercial fishing industries and in cooling towers. These products are sold in all fifty states and in several foreign countries. In July 1984 Shepherd hired John O. Bertotti as sales manager. Bertotti had a graduate degree in mechanical engineering and prior experience with chemical companies. He did not have any prior experience with the products marketed by Shepherd. As a condition of employment, Bertotti signed an employment agreement acknowledging the confidential nature of the company's business and agreeing not to disclose trade secrets or confidential information. He also agreed not to compete with the company for a period of two years following termination of his employment.

In late 1985 Bertotti and Jerral Downs, a co-employee, explored the possibility of going into business for themselves. They first considered buying an existing business but later considered starting a new company to compete with Shepherd in the manufacture and sale of "film pack." Film pack is a product used in cooling towers to provide a heat exchange medium. Downs decided that forming the new company would involve a breach of the employment contract with Shepherd and he chose not to pursue the venture. Downs told Bertotti he was not interested and he urged Bertotti to focus instead on the opportunities available at Shepherd.

In 1986 Charles E. Shepherd, president of C.E. Shepherd Co., Inc., became dissatisfied with Bertotti's work record. He felt that Bertotti did not handle people well and had not initiated new markets as requested. Mr. Shepherd testified that he later became suspicious that Bertotti was setting up a competing company and he discussed his concerns and suspicions with Bertotti on May 8 or 9, 1986. Bertotti denied that he was starting a competing business and assured Mr. Shepherd that he wanted to remain with the company. Later that same day, Mr. Shepherd learned that Bertotti had been seen early in the morning copying company information and placing it in two briefcases, which he then put in his car. Mr. Shepherd called Bertotti back into his office, confronted him with this new information and asked to see the contents of the briefcases. Bertotti refused and Mr. Shepherd immediately terminated his employment.

The following month, Bertotti and several other investors incorporated Houston Engineered Products Corporation (HEPCO) for the primary purpose of manufacturing and marketing film pack. When the funding for HEPCO was delayed, Bertotti and the same investors formed Pact Wire, Inc. to be the exclusive sales and engineering representative for a line of wire products sold by Riverdale Mills, a competitor of Shepherd.

Shepherd then sued for breach of his employment agreement and sought injunctive relief from the use of its trade secrets. The trial court granted a temporary injunction, which reads in part:

ORDERED that JOHN O. BERTOTTI, PACT WIRE, INC. and HOUSTON ENGINEERED PRODUCTS CORPORATION, Defendants, be commanded forthwith to desist and refrain from directly or indirectly, in any manner, selling or offering to sell goods or materials of any kind to customers of C.E. Shepherd Co., Inc. in any state of the United States or any foreign country in which C.E. Shepherd Co., Inc. does business until this Order can be replaced by a judgment entered in this cause.

The court then set the case for trial on April 26, 1987.

Prior to trial, Bertotti filed for bankruptcy and all three appellants filed motions to

stay the proceedings. The trial court granted the motions and removed the case from the trial docket. This appeal was taken from the granting of the temporary injunction.

■ The purpose of a temporary injunction is to preserve the status quo pending trial on the merits. *Matlock v. Data Processing Security, Inc.*, 618 S.W.2d 327, 328 (Tex.1981). The applicant need only show a probable right and probable injury and is not required to establish that he will prevail in the final litigation. *State v. Southwestern Bell Telephone Co.*, 526 S.W.2d 526, 528 (Tex.1975). Also, the temporary injunction hearing is not a hearing on the merits. Therefore, the only question before this court on appeal is whether the trial court abused its discretion in issuing the injunction. *Electronic Data Systems Corp. v. Powell*, 524 S.W.2d 393, 395 (Tex.Civ.App.—Dallas 1975, writ ref'd n.r. e.). The standard of review is to determine if the trial court misapplied the law to established facts, or if the evidence does not reasonably support the conclusion that the applicant has a probable right of recovery. *State v. Southwestern Bell Telephone Co.*, 526 S.W.2d at 528. The appellate court must then draw all legitimate inferences from the evidence in the light most favorable to the trial court's judgment. *David v. Bache Halsey Stuart Shields, Inc.*, 630 S.W.2d 754, 757 (Tex. App.—Houston [1st Dist.] 1982, no writ). With these standards in mind, we review appellants' points of error.

In point of error one, appellants argue the trial court erred in ordering the temporary injunction because the covenant not to compete is a restraint on trade, is unnecessary to protect the business and goodwill of the company and is not supported by the evidence. In point of error two, appellants contend that the covenant is unreasonable.

■ An agreement on the part of an employee not to compete with his employer after termination of employment is in restraint of trade and will not be enforced unless its terms are reasonable. A covenant is unreasonable if the restraint is greater than is required for the protection of the person for whose benefit it is imposed or imposes undue hardship upon the person restricted. *Weatherford Oil Tool Co. v. Campbell*, 161 Tex. 310, 340 S.W.2d 950, 951 (1960); *see also* Restatement (Second) of Contracts § 188 (1981).

■ To be found reasonable, the covenant must: (1) be necessary for the protection of the promisee; (2) must not be oppressive to the promisor; (3) must not be injurious to the public; and (4) should be enforced only if the promisee gives consideration for something of value. *Hill v. Mobile Auto Trim, Inc.*, 725 S.W.2d 168, 170–71 (Tex.1987).

■ In deciding whether a covenant is necessary for the protection of the promisee, we must first determine if the promisee has a legitimate interest in protecting its business goodwill or trade secrets. *Hill*, 725 S.W.2d at 170–71. Shepherd spends between two and three hundred thousand dollars each year on research and development. To protect that expenditure, as well as any confidential data discovered and developed by such research, Shepherd adopted strict security measures. Prospective employees are required to sign an employment agreement and Shepherd established a practice of suing employees who violate those agreements. The Shepherd plant is closed to all outsiders and guards are on duty when management is not there. Non-employees who enter the plant for any reason are required to sign an agreement to protect the confidentiality of anything they see or learn during the tour of the plant. Finally, documents and paperwork that are to be discarded are first shredded.

Shepherd asserts a particular and special interest in protecting the trade secrets of film pack and wire products. Jerral Downs, general manager and vice-president of operations for Shepherd, testified that the company manufactured about five million linear feet of film pack to fill a Southwestern Public Service order in 1982. At that time the film pack was manufactured by a roll-forming device. Following the sale, the marketing of the product was temporarily suspended while Shepherd con-

ducted additional research and development on film pack and explored other production techniques. While film pack is not a new product, its market potential is growing, production methods are changing and it is a profitable market in which Shepherd is involved. Downs testified that it takes a lot of time to enter the market with expectations of commercial success because technical data, such as the angle and size of the corrugation and the thickness of the sheet and its application, has been difficult and costly to develop. Furthermore, the machines that make film pack must be modified in order to produce the specific design desired by each specific customer. Shepherd even hired an outside thermo engineer who was a specialist on cooling towers to serve as a consultant in the development stages of film pack.

The evidence indicates that Shepherd's film pack trade secrets were in need of protection. Trade secrets have been defined as follows:

A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers....

*Hyde Corp. v. Huffines*, 158 Tex. 566, 314 S.W.2d 763, 776 (1958), quoting Restatement of Torts § 757 (1939). The data compiled and applied by Shepherd qualifies as trade secrets. As sales manager, Bertotti was privy to trade secrets and confidential information in order to sell the company's products. Within the first week of his employment with Shepherd, Bertotti spent time in every production department in order to familiarize himself with the company products. In particular, he participated with the salesmen and production people in an orientation seminar. Bertotti was also involved in most if not all stages of the development of film pack. Jerral Downs testified that Bertotti was present at meetings with the thermo engineering consul-

tant. Bertotti had a master's degree in mechanical engineering and those working on the project looked to him for mechanical contributions as well as sales input. His primary function, however, was to gather marketing information and develop a project plan for the product.

Bertotti was very interested in the potential for film pack and he set up several meetings with management to determine whether to produce it. Berotti also set up meetings with Jerral Downs to discuss setting up their own company to take advantage of the sales potential of film pack. Bertotti was seen copying material the day he was terminated and he later testified he was copying information for a business plan for HEPCO. HEPCO was organized to compete with Shepherd to manufacture and market service media products, particularly film pack, in the central United States. Bertotti testified that he began looking for financing for HEPCO in early 1986, and that prior to his termination he discussed forming such a company with Michael Peyret. Peyret subsequently helped finance the venture.

HEPCO was incorporated in June of 1986 and was ready to begin producing film pack at the time of the November hearing. Neither Peyret nor William Campbell, principal owners with Bertotti in HEPCO, had any previous experience with any of these products. Bertotti was the only one in the newly formed company with knowledge of the manufacturing process, pricing, marketing, and potential customers for the products they would manufacture and sell. He was also the only engineer on the HEPCO staff and the only person with knowledge of the proper machinery to purchase to produce the products economically. His knowledge was gained solely through employment with Shepherd and his involvement in Shepherd's research and development of the products. Jerral Downs testified that in forming the new company, Bertotti had the advantage of four years of trial and error encountered by Shepherd in its research program. Indeed, within five months of his departure from Shepherd, Bertotti stood ready to manufacture a

product that he knew nothing about prior to his employment with Shepherd, and to go into direct competition with Shepherd in violation of his non-competition covenant.

Bertotti testified that HEPCO's film pack was intended for the same use as Shepherd's, but that it was not the "same" product. He also testified that Shepherd was not in the business of making the product when HEPCO was formed. According to Bertotti, the machine Shepherd used to produce the original Southwestern Public Service order was moved to the new plant and was never run in that plant. He alleged that research and development on film pack was shut down in December 1984. Bertotti was contradicted by Downs' testimony that research and development had not been discontinued and that Shepherd planned to manufacture and market film pack with a revised vacuum forming manufacturing procedure. It is interesting to note that HEPCO also planned to utilize this specialized manufacturing method. Further, one trial exhibit was a summary of a project review committee meeting held on December 12, 1984, on the subject of "film pack process review." The memo reviewed the progress of several "action items" and scheduled another meeting for January 17, 1985. Bertotti claims the January meeting never took place. Downs also testified that the company sent film pack sheets to another company in October 1985 in the process of investigating the feasibility of using some adhesives produced by that company. Therefore, the evidence showed that Shepherd was indeed still in the business of developing film pack for sale in the United States and in foreign countries.

■ The fact that Shepherd was not actually *producing* film pack when HEPCO was formed is irrelevant. The mere fact that a company is not utilizing information at the present time does not prevent that information from being a trade secret subject to protection. *Elcor Chemical Corp. v. Agri–Sul, Inc.,* 494 S.W.2d 204, 213 (Tex. Civ.App.—Dallas 1973, writ ref'd n.r.e.), citing *Harris Mfg. Co. v. Williams,* 157 F.Supp. 779 (W.D.Ark.1957). Appellants

argue that samples of the corrugated sheets that make up film pack, as well as film pack itself, are available from each of the manufacturers for reproduction by others. However, the testimony showed that variables such as temperature and pressure enter into the design of film pack thereby making duplication of the product difficult without the benefit of the results of research and development. Furthermore, Bertotti had no experience with film pack prior to his employment with Shepherd, and he gained knowledge of that product only by way of his confidential relationship with the company.

> The fact that a trade secret is of such a nature that it can be discovered by experimentation or other fair and lawful means does not deprive its owner of the right to protection from those who would secure possession of it by unfair means. An injunction to prevent one from making use of trade secrets acquired in a confidential relationship such as that of the employer and employee relationship does not run counter to public policy which discourages contracts which tend to lessen competition.

*Weed Eater, Inc. v. Dowling,* 562 S.W.2d 898, 901 (Tex.Civ.App.—Houston [1st Dist.] 1978, writ ref'd n.r.e.), citing *K & G Oil Tool & Service Co. v. G & G Fishing Tool Service,* 158 Tex. 594, 314 S.W.2d 782 (1958). "Even in the best of good faith, [Bertotti] can hardly prevent his knowledge of his former employer's confidential methods from showing up in his work." *Weed Eater,* 562 S.W.2d at 902. Given the time, money and effort expended on the development of film pack, the strict security precautions taken and the threat posed by Bertotti through the formation of HEPCO, we find that Shepherd has a legitimate interest in protecting those trade secrets relating to film pack.

As to the protection of trade secrets relating to wire products, Shepherd is concerned that certain protected knowledge could give an unfair advantage to a competitor. That protected information would now be available to Riverdale Mills through Pact Wire, Inc., the company formed by Bertotti, Peyret, Campbell and the other

HEPCO investors. Pact Wire was formed to be the exclusive sales and engineering representative for a line of Riverdale Mills wire products. There is no question that products to be sold by Pact Wire are in competition with products offered for sale by Shepherd.

The information Shepherd considers confidential includes coating processes, machine modifications, engineering prints, pricing formulas, sales data, customer lists and marketing strategies. The most sensitive data is price and customers. Charles Shepherd testified that the basis for competition in this market is primarily price. Bertotti testified as to his involvement in organizing the company's pricing practices and his access to sales data and customer lists. The latter were printed out in several formats such as by market or credit rating, and they contained information that is not readily ascertainable such as credit histories and the name of the decision maker within a company. Furthermore, a card file containing the names of seventy-five customers was taken by Bertotti and later returned when the lawsuit was filed. Clearly, Bertotti gained all of his knowledge about the wire product market while at Shepherd. Unfair use of this knowledge will damage Shepherd. Bertotti planned to contact customers of Shepherd on behalf of Riverdale Mills and to sell competing products. Therefore, we also find that Shepherd has a legitimate interest in protecting information relating to its wire products and that the covenant not to compete contained in the employment agreement is necessary for that protection.

■■■ We next must determine if the covenant is oppressive to the promisor. In this case, enforcement of the covenant will not deprive Bertotti of the ability to work. He has a graduate degree in mechanical engineering and worked in the plastics industry for twenty-five years prior to his employment at Shepherd. Clearly, his expertise is not limited to coated poultry wire, wire components for cooling towers or film pack. He testified that he had no knowledge of these products prior to his employment with Shepherd. Enforcement of the covenant requires only that he find temporary employment in some other phase of the plastics industry. This is not an undue hardship. *See Unitel Corp. v. Decker,* 731 S.W.2d 636, 640 (Tex.App.—Houston [14th Dist.] 1987, no writ).

■■■ Appellants complain that the covenant not to compete contains no definable territory. The period of time during which the restraint is to last and the territory that is included are important factors to be considered in determining the reasonableness of an agreement. *Weatherford Oil Tool v. Campbell,* 340 S.W.2d at 951. However, an agreement does not become void and unenforceable simply because it is not reasonably limited as to either time or area. A court may still enforce the agreement by granting an injunction restraining a former employee from competing for a specified time and within a specified area, so long as they are reasonable under the circumstances. *Id.,* 340 S.W.2d at 952.

■■■ The Shepherd employment agreement states that the company conducts business throughout the United States and in numerous foreign countries. Charles Shepherd testified that the company makes sales in all fifty states and in Great Britain, Australia, Central and South America and Mexico. Bertotti solicited business in the United States and abroad while employed with Shepherd. We hold that the injunction encompasses the language of the employment agreement and is supported by the evidence. We further find that under the circumstances of this case the covenant is not unreasonable as to area.

Next, according to *Hill,* covenants not to compete may not be injurious to the public as courts are reluctant to enforce covenants that prevent competition and deprive the community of needed goods. 725 S.W. 2d at 171. We find that enjoining Bertotti, HEPCO and Pact Wire does not injure the public. There was testimony that at least five other companies market film pack and Riverdale Mills is already competitive with Shepherd in the coated wire products market. Consequently, there is neither impairment of competition nor deprivation of needed goods.

■ Finally, covenants not to compete should be enforced only if the promisee gives consideration for something of value. It has been held that the giving of employment is a valuable consideration for a restrictive covenant not to compete. *Carl Coiffure, Inc. v. Mourlot,* 410 S.W.2d 209, 211 (Tex.Civ.App.—Houston 1966, writ ref'd n.r.e.). Also, the special training or knowledge acquired by an employee through his employer is valuable consideration and often enhances his value to other companies. *Hill,* 725 S.W.2d at 171. We find that the covenant not to compete contained in the Shepherd employment agreement is reasonable under both the *Weatherford* and *Hill* tests. Appellants' points of error one and two are overruled.

In point of error three, appellants argue that the temporary injunction was entered in error because there was insufficient evidence to support the finding that HEPCO and Pact Wire obtained possession of Shepherd's trade secrets through Bertotti. Appellants contend that there are no trade secrets to protect as the information considered confidential is either readily ascertainable or of general knowledge in the industry.

■ While some of the information at issue *could* have been obtained from other sources, the evidence shows that it was all obtained solely by way of the confidential relationship. *See Elcor Chemical Corp.,* 494 S.W.2d at 212–13. By his own admission, Bertotti had not dealt with film pack prior to his employment at Shepherd. His partners Peyret and Campbell had backgrounds in accounting and finance and had no prior experience with film pack or the plastics industry. Again, five months after Bertotti left Shepherd, HEPCO was ready to enter the film pack market. It was only through his employment at Shepherd that Bertotti saw the potential for film pack and learned about the market, the components, the machines and the manufacturing process. Also, Bertotti had no previous experience with certain wire products prior to his employment at Shepherd, and all of his knowledge of those products comes from his access to Shepherd's confidential data

regarding production, marketing, pricing and sales, as well as Shepherd's customer lists containing information about credit ratings, buyers and preferences.

Although both Peyret and Campbell testified that Bertotti had not disclosed confidential information to them, it is undisputed that they would have benefited from that information by the sales of the products by HEPCO, Pact Wire and Riverdale Mills. We find that the evidence is sufficient and we overrule point of error three.

■ In point of error four, appellants argue that the trial court erred in ordering a temporary injunction against appellants because Shepherd acted in bad faith. Appellants claim that Bertotti was fired for insufficient reasons and that appellee is therefore precluded from coming into a court of equity to enforce the covenant not to compete.

Charles Shepherd testified that he was not happy with Bertotti's performance *prior* to the termination. He stated that Bertotti had failed to develop new customers and markets for the company's products. In addition, Mr. Shepherd had met with Bertotti several times to discuss the latter's difficulty in handling other employees and customers. The problem intensified when Mr. Shepherd began to suspect that Bertotti was planning to form a company to compete with Shepherd. This evidence is not refuted.

Bertotti presented no evidence of bad faith. He did point to the company's increased profits during the term of his employment as evidence of his satisfactory performance as sales manager; however, Mr. Shepherd testified that he felt the increase reflected the fact that the poultry market in particular has grown consistently over the past five years. We find there were good reasons for terminating Bertotti and that the termination of employment was not grounded in bad faith. Point of error four is overruled.

■ In point of error five, appellants complain that the trial court did not provide a date certain in the temporary injunction order for the trial of this matter. The

temporary injunction order was entered on December 22, *1986*, and stated "that trial on the merits of this cause is set for the 13th day of April, *1986*." Appellants argue that the order thus failed to set a proper date for the trial on the merits and is therefore void. Appellee replies that the date of April 13, *1986*, is simply a typographical error as the docket sheet reflects that the case was set for trial on April 13, *1987*. We find that the parties understood that the trial was set for *1987* and that the trial was stayed by appellant's Motion to Stay pending bankruptcy proceedings. We hold that the trial date recited in the temporary injunction order is a typographical error that has been corrected by nunc pro tunc entry. *Gray v. State*, 628 S.W.2d 228, 233 (Tex.App.—Corpus Christi 1982, pet. ref'd). Further, the error does not affect the validity of the order. Point of error five is overruled.

In reviewing all of the evidence, we find that the evidence supports the finding of the trial court that appellee has a probable injury and a probable right of recovery. We also find that the trial court did not abuse its discretion in issuing the temporary injunction against appellants. In their final point of error, appellants argue that the temporary injunction order is overbroad because it does not specify who Shepherd's customers are and because it prohibits the selling or offering to sell goods or materials of *any* kind.

Orders generally restraining solicitation of customers and not specifically listing the individual customers have not been found to be overbroad. *See Electronic Data Systems Corp.*, 524 S.W.2d at 393. We do find, however, that the language prohibiting the "selling or offering to sell goods or materials of any kind" is overbroad. The Shepherd employment agreement provides that for a period of two years after termination an employee will not undertake to *compete* with the company. The intent behind that covenant is to prevent the employee from benefiting at Shepherd's expense from trade secrets learned while employed at Shepherd. Those trade secrets do not affect the sale of unrelated goods

and materials to Shepherd customers by other companies. To prohibit appellants from selling *any* goods to Shepherd customers goes beyond both the purpose and the scope of the covenant not to compete and is thus overbroad.

Accordingly, we sustain point of error six in part and we reform the temporary injunction to read as follows:

ORDERED that JOHN O. BERTOTTI, PACT WIRE, INC. and HOUSTON ENGINEERED PRODUCTS CORPORATION, Defendants, be commanded forthwith to desist and refrain from directly or indirectly, in any manner, selling or offering to sell to any persons or entities that are customers of C.E. Shepherd Co., Inc., any goods or materials that compete with or can be substituted for any product, goods or material offered for sale by C.E. Shepherd Co., Inc. in any state of the United States or any foreign country in which C.E. Shepherd Co., Inc. does business until this Order is replaced or dissolved by a judgment entered in this cause.

The judgment of the trial court is affirmed as modified.

DRAUGHN, Justice, dissenting.

I respectfully dissent from the majority opinion. I find the injunction to be overbroad as to its product limitations. I find that the majority's additional modifying language compounds the problem. In my opinion, it is an improper broadening of the injunction and constitutes an impermissible restraint of trade. I find the covenant not to compete, as interpreted by the majority here and the court below, to be unreasonable, oppressive, and injurious to the public. *See Hill v. Mobile Auto Trim, Inc.*, 725 S.W.2d 168, 170–171 (Tex.1987). I would modify the injunction to prohibit the sale of film pack by appellant to any customers of appellee and prohibit appellant from selling any other products sold by appellee at the time he left their employment. This latter restriction would be limited to those customers of appellee with whom appellant had specific contact during his employment with appellee.

I would eliminate any reference as to "substituted products" because the essence of fair competition is grounded on the concept that if one can make or sell a different or better product than the competition, one is entitled freely to market it. Particularly this concept is applicable here where the customers are limited and their names are readily available in the market place. The ultimate beneficiary of such competition is the consumer. To inhibit such competition is, in my opinion, an impermissible restraint of trade.

In sum, I find the covenant as interpreted to be unreasonable because it restrains fair competition, provides greater protection for the appellee than is necessary, and imposes an undue hardship on the appellant. I would modify the injunction as stated.