NO. 07-01-0117-CV



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL D



DECEMBER 14, 2001



______________________________




THE VARIABLE ANNUITY LIFE INSURANCE COMPANY, APPELLANT



V.



MICHAEL J. MILLER, APPELLEE




_________________________________



FROM THE 181ST DISTRICT COURT OF RANDALL COUNTY;



NO. 49,285-B; HONORABLE JOHN B. BOARD, JUDGE



_______________________________



Before BOYD, C.J., and QUINN and REAVIS, JJ.

 In two issues, appellant, the Variable Annuity Life Insurance Company (VALIC),
challenges a temporary injunction granted in its lawsuit against appellee Michael J. Miller
(Miller) for injunctive and monetary relief for his alleged wrongful competition and use and
disclosure of VALIC's trade secrets and confidential and proprietary information. VALIC
claims that (1) the scope of the injunction is too narrow as a matter of law, and (2) the
exceptions to the injunction are too vague and contrary to the law and the facts. We affirm
the order of the trial court.

 VALIC sells and services fixed and variable tax-deferred annuities to clients who
work for non-profit organizations such as colleges, public school systems, non-profit
healthcare organizations, and governmental entities. Miller was a sales agent who worked
for VALIC from April 15, 1991, until July 14, 2000, when he resigned to begin work for a
competitor, PMG/Kemper. Miller has accepted business from at least 32 former VALIC
clients since his resignation. It is the contention of VALIC that Miller wrongfully used
information obtained from VALIC to solicit VALIC's clients and obtain their business on
behalf of PMG/Kemper. 

 In the order on plaintiff's petition for temporary injunction signed on March 12, 2001,
the court enjoined Miller as follows:

 (i). Mr. Miller is hereby enjoined and restrained, during the duration of this
suit, from personally accessing, reviewing, using, or disclosing to any
source, the trade secrets, confidential information, and proprietary
information of VALIC, other than for the defense or prosecution of this suit. 
The terms "trade secrets," "confidential information," and "proprietary
information" as used herein shall be defined in accordance with paragraph
4.3(b)(1) and (2) of the Agreement, subject to the terms of this Order;


 (ii). Miller shall immediately return to VALIC any original trade secrets,
confidential information, and proprietary information in his or his counsel's
possession. Copies of such trade secrets, confidential information, and
proprietary information produced in discovery of this cause may be retained
by Mr. Miller's counsel only for the purposes of the on-going litigation in this
cause and shall not be disclosed to any source other than Plaintiff and the
Court, unless otherwise ordered by the Court or upon agreed order.


The court further added two exceptions to the injunction as follows:


 b. This Order shall not prevent, restrain, or enjoin Mr. Miller from utilizing
information about VALIC's current or former customers actually received
from any other source, e.g., the customer, the customer's employer, faculty
directories, the telephone book, Internet web sites or other information
available to the general public or available to Mr. Miller as a result of his
status or another company's status as an approved vendor or provider of
retirement products to the State of Texas;


 c. This Order shall not prevent, restrain, or enjoin Mr. Miller from utilizing his
general knowledge, skill and experience obtained during his relationship with
VALIC or prior thereto regarding any current or former VALIC customer's
identity, customer requirements and preferences, asset allocations, and
account information. 


VALIC argues that this order fails to adequately protect it and the injunction should have
prevented Miller from soliciting or accepting any business from VALIC clients he formerly
serviced during the pendency of the lawsuit. 

 VALIC relies on Rugen v. Interactive Business Systems, Inc., 864 S.W.2d 548
(Tex.App.--Dallas 1993, no writ), in support of its argument. In that case, the court found
that even though a non-competition agreement was void, Sharon Rugen, a former
employee of Interactive Business Systems, Inc. (IBS), had confidential information of IBS
which deserved protection. Id. at 550. The trial court had entered a temporary injunction
prohibiting Rugen from calling on, soliciting, or transacting business with consultants
retained by IBS or IBS customers until a final judgment was rendered. Rugen complained
on appeal that the order was an abuse of discretion because it enjoined competition, the
information was not a trade secret, there was no showing she would wrongfully use the
information, and the order did not describe in reasonable detail the acts to be enjoined.
The court found no abuse of discretion because Rugen was not prevented from organizing
a competing firm and developing her own clients, Rugen herself considered the identity
of clients, prospective clients, potential projects, and pricing information to be confidential,
Rugen had such information and it was probable she would use it to IBS's detriment, and
the information contained in exhibits referred to in the injunction explicitly defined the
prohibited conduct. Id. at 551-53. 

 In the case before us, the court declined to enter as broad an injunction as the court
did in Rugen and included two exceptions to the prohibited use of certain materials. We
must therefore determine if the record shows a clear abuse of discretion on the part of the
trial court in doing so. In our review, we draw all legitimate inferences from the evidence
in the light most favorable to the trial court's judgment. Miller Paper Co. v. Roberts Paper
Co., 901 S.W.2d 593, 598 (Tex.App.--Amarillo 1995, no writ); Bertotti v. C. E. Shepherd
Co., Inc., 752 S.W.2d 648, 651 (Tex.App.--Houston [14th Dist.] 1988, no writ). The trial
court abuses its discretion when it misapplies the law to the facts or when the evidence
does not reasonably support the findings of probable injury or probable recovery, which
are necessary to the granting of a temporary injunction. State v. Southwestern Bell Tel.
Co., 526 S.W.2d 526, 528 (Tex. 1975). 

 Under the common law, an employee may not use confidential or proprietary
information acquired during the relationship adversely to his employer, and that obligation
survives the termination of employment. Thus, while a former employee may use the
general knowledge, skill, and experience acquired during the employment relationship, he
may not utilize confidential information or trade secrets acquired during the course of
employment. American Derringer Corp. v. Bond, 924 S.W.2d 773, 777 (Tex.App.--Waco
1996, no writ); Miller, 901 S.W.2d at 600-01. Protected data includes compilations of
information which have a substantial element of secrecy and provide the employer with an
opportunity for advantage over competitors. Id. at 601; Rugen, 864 S.W.2d at 552. 
Examples can include pricing information, customer lists, client information, customer
preferences, buyer contacts, and market strategies. Id. at 552; Bertotti, 752 S.W.2d at
644-45. 

 Even if certain business information is confidential, the same information may be
capable of being obtained by observation, experimentation, inspection, analysis or general
inquiry. M. N. Dannenbaum, Inc. v. Brummerhop, 840 S.W.2d 624, 632 (Tex.App.--
Houston [14th Dist.] 1992, writ denied); Jeter v. Associated Rack Corp., 607 S.W.2d 272,
275 (Tex.Civ.App.--Texarkana 1980, writ ref'd n.r.e), cert. denied, 454 U.S. 965, 102 S.Ct.
507, 70 L.Ed.2d 381 (1981). However, that information can still be protected if the
competitor gains the information through a breach of confidence without the efforts of
observation, experimentation, inspection, analysis or general inquiry. Dannenbaum, 840
S.W.2d at 632; Jeter, 607 S.W.2d at 275-76. 

 In its order, the court held that the covenant not to compete was an unreasonable
restraint of trade and was unenforceable. The court did find, however, that VALIC had
shown a probable right to recover on its common law claims for actual and probable use
and/or disclosure of its trade secrets, confidential and proprietary information and probable
injury from those actions. 

The court also found as follows:

 Miller, after resigning from VALIC, maintained a laptop computer, software,
forms, lists, and client information that he had promised to return and keep
secret. Miller has returned some of this material, but may still have suchinformation personally or in the possession of counsel. Miller personally
accessed or reviewed at least some of this information and disclosed a client
list to his new employer. If a temporary injunction is not granted based on
these claims, VALIC will suffer imminent harm and irreparable injury and will
have no adequate remedy at law because the threat is imminent that Miller
will disclose VALIC's trade secrets, confidential information, and/or
proprietary information. 


 A temporary injunction such as the one sought by VALIC, which would prohibit Miller
from contacting any customers and clients of VALIC prior to final judgment, has been found
not to be an abuse of discretion. See Rugen, 864 S.W.2d at 553; Stocks v. Banner
American Corp., 599 S.W.2d 665, 668 (Tex.Civ.App.--Texarkana 1980, no writ). However,
that does not mean that a less restrictive injunction automatically constitutes an abuse of
discretion. In Johnston v. American Speedreading Academy, Inc., 526 S.W.2d 163
(Tex.Civ.App.--Dallas 1975, no writ), a provision in a temporary injunction prohibiting the
defendants from "[c]ontacting, communicating or soliciting with any customer of Plaintiff
derived from any customer list, customer lead, mail, printed material or other information
secured from Plaintiff or its present or past employees" was proper. Id. at 165-66. This
injunction did not prohibit all contact with the complainant's customers, only that contact
derived from information obtained from the complainant. 

 The testimony at the hearing on the temporary injunction showed that a number of
companies, including VALIC, were authorized to participate in the optional retirement
program offered by Amarillo College, West Texas A&M University (WTAMU), and other
higher education institutions. Therefore, the representative of VALIC agreed that the
potential pool of customers was not a trade secret. Miller had been both a student and a
teacher at WTAMU and had taught seminars at Amarillo College prior to going to work for
VALIC. He had also been a VALIC client. Miller testified he built up his initial business
based on the individuals he knew and friendships he had prior to working for VALIC. After
commencing work for VALIC, he built up his client base as a result of referrals from those
individuals and from having contact with human resource directors at institutions of higher
learning, who provided him with names of new faculty members whom he knew would
probably be eligible for the retirement program. Information as to faculty members was
available from a faculty directory, the internet, or the human resource department. That
same information would also be available to competitors of VALIC. The length of time an
individual had worked at a particular school and his title would indicate the relative size
of his investments. Once an individual was contacted, he could provide information as to
his particular investments. The evidence additionally indicated that Miller retained at least
some information as to the names of his former clients, the relative size of their accounts,
the type of investments they made, and whether they were averse to risk or risk tolerant.

 The parties agree that Miller should not have access to information generated from
VALIC's software programs. It is the information contained in Miller's memory that is the
real issue of contention between the parties. Miller asserts that this information is not
protected because it is either part of his general knowledge or equally available to
competitors of VALIC while VALIC claims the information is proprietary. 

 The court stated its intentions at a hearing to clarify the temporary injunction:

 Let me say with regard to my intentions to competing and contacting persons
who he serviced during that previous year, it was my intent - - and I want to
make it clear - - that I was not - - that he should not be prohibited from
contacting those people. And that was my concern was that then there
would be arguments well, you know, by contacting them, then you must have
used confidential information. And that's why I tried to say there are
numerous sources from which he could have got that information, you know,
not - - not from the [sic] his association with VALIC. But I wasn't clear on
what's in his head. And the problem with that, and I think one of the cases
I looked at pointed that out - - I don't know how you would ever enforce that. 
To say that he can't use the information that's in his head. But I was trying
to make clear that he shouldn't refer to any proprietary software, or things
that have been downloaded from that. But as far as my reading of the Miller
Paper case, is that those kind of things that are in your head. You can't
make somebody download those things. And that seems to me just one of
the risks you take when you hire people, is that they're going to obtain some
knowledge. 


* * *



 But on the other hand, the fact that somebody may be risk averse is
something he's going to know from years of service with them. And you can't
make him stop knowing that. And as a practical matter, all you've got to do
when you sit down with somebody is say are you risk averse, and they are
going to tell you yes I am, or no I'm not. So I - - I understand your concern
there, and I was concerned about that, too. And I didn't want to, by my
ruling, place Mr. Miller and VALIC in a position of having to come back and
reargue that. So I would like the order to be specific about that. And it
wasn't - - it certainly - - again, unless I hear something different, it was my
intent that certainly he would be able to use any information that he has in
his brain, just because I don't think there is any way to prevent it.


* * *



 . . . [L]et's assume for a minute that Mr. Miller just came off the street and
became a Kemper representative. He could easily go to any VALIC or any
other representative, go to any other current VALIC client and say: What's
your account balance? And: What's your risk aversion? And more than
likely they would tell him. And so to somehow handicap him because of a
prior relationship he had with VALIC seems to me to be patently unfair. And
especially in light of the fact I have found the anti-competition clause is
ineffective. My feeling about the proprietary information was mainly the
computer software VALIC had developed, and it wouldn't be fair for him to
give that to Kemper. But with respect to whether or not a client is - - is risk
averse - - I mean, it could easily be said that VALIC wouldn't have had that
client had it not been for Mr. Miller getting them for him in the first place. So
to say he wouldn't have known that except for us, he could easily say you
wouldn't have known it except for me. And to somehow say well, obviously
if he contacts one of our customers, it's because of information we gave to
him - - based on the evidence and testimony he knew those people from
working - - a lot of them from working at the college . . . .


 VALIC claims that, based on Rugen, the only type of injunction that will adequately
protect it is the type of injunction entered by that court. However, in Rugen, it was
stipulated by the parties that customer and pricing information, the identity of consultants
and the pricing of those consultants was confidential information. Rugen, 864 S.W.2d at
552. In the case at bar, the parties hotly dispute, based on the particular facts of this case,
whether similar information is confidential. Moreover, the Rugen court did not specifically
address the matter of information retained in the memory of a former employee.

 In Miller Paper, employees of Roberts Paper Company, which sold and distributed
paper, janitorial and chemical products, left the company to form a competing business and
began soliciting Roberts's clients. We found the trial court was within its discretion to
enjoin the use of any of the documents, records, files and hard copy taken by former
employees of Roberts Paper Company, which those employees asserted was not
confidential information. Those documents included a customer list and a document
known as "the book," which contained customers' names, addresses, special billing
information, delivery sites, information regarding the need for purchase orders, cash on
delivery data, and phone numbers. Miller Paper, 901 S.W.2d at 597. The former
employees were free to compete, but not with materials developed by or on behalf of
Roberts. Id. There was no mention that the former employees had retained any of this
information by memory.

 VALIC argues that Miller is precluded by contract from providing the type of
information excepted from the injunction. The contract between VALIC and Miller provides
that Miller may not disclose trade secrets during or after termination of his contract. Trade
secrets are defined as materials, processes, documentation, and knowledge embodied in
4SIGHT and other licensed software described in attached schedules, as well as customer
identities and account information. Miller is also precluded by contract from disclosing
other confidential and proprietary information during the term of the contract and for two
years thereafter. Other confidential and proprietary information is defined as customer
requirements, other VALIC software, and marketing plans whether maintained
electronically or otherwise. In the temporary injunction, the court tied the prohibited
activity to these contractual provisions. The exceptions under the temporary injunction are
information about customers actually received from other sources or available to Miller as
a result of his or his new employer's status as an approved vendor of retirement products
to the State of Texas and general knowledge, skill, and experience obtained during his
relationship with VALIC or prior to that relationship. The court showed its intent to
preclude the use or disclosure of written information, information downloaded from
computers, or computer software, but not information retained by Miller or which was
generally available to the general public or competitors of VALIC. Thus, Miller is free to
compete, but not with materials developed by or on behalf of VALIC. 

 It is argued by VALIC in reliance on Dannenbaum that Texas courts do not
distinguish between written and memorized information. See Dannenbaum, 840 S.W.2d
at 632. In noting that the Restatement of Agency makes such a distinction, that court
explicated that Texas courts either analyze the difficulty in obtaining the information and
whether it is readily accessible by industry inquiry or focus on the method used to obtain
the information. Id. at 632-33. The evidence in the record that much of Miller's client base
was established through friendships and relationships existing prior to his employment with
VALIC and through human resources personnel and directories available to other
competitors reasonably supports the trial court's decision in this regard. To issue the sort
of injunction requested by VALIC would bar Miller from selling products even to former
clients who initiate contact with him and whose needs and financial status may have
changed since he last sold them any products. We find no abuse of discretion on the part
of the trial court with respect to the temporary injunction. 

 Thus, VALIC's issues are overruled, and the judgment of the trial court is affirmed.


 John T. Boyd

 Chief Justice


Do not publish.



EN-US;
 font-style:italic;}
p.MsoHeading8, li.MsoHeading8, div.MsoHeading8
 {mso-style-noshow:yes;
 mso-style-priority:9;
 mso-style-qformat:yes;
 mso-style-link:"Heading 8 Char";
 mso-style-next:Normal;
 margin-top:10.0pt;
 margin-right:0in;
 margin-bottom:0in;
 margin-left:0in;
 margin-bottom:.0001pt;
 line-height:115%;
 mso-pagination:widow-orphan lines-together;
 page-break-after:avoid;
 mso-outline-level:8;
 font-size:10.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;
 mso-bidi-language:EN-US;}
p.MsoHeading9, li.MsoHeading9, div.MsoHeading9
 {mso-style-noshow:yes;
 mso-style-priority:9;
 mso-style-qformat:yes;
 mso-style-link:"Heading 9 Char";
 mso-style-next:Normal;
 margin-top:10.0pt;
 margin-right:0in;
 margin-bottom:0in;
 margin-left:0in;
 margin-bottom:.0001pt;
 line-height:115%;
 mso-pagination:widow-orphan lines-together;
 page-break-after:avoid;
 mso-outline-level:9;
 font-size:10.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";
 color:#404040;
 mso-bidi-language:EN-US;
 font-style:italic;}
p.MsoFootnoteText, li.MsoFootnoteText, div.MsoFootnoteText
 {mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-link:"Footnote Text Char";
 margin:0in;
 margin-bottom:.0001pt;
 mso-pagination:none;
 mso-layout-grid-align:none;
 text-autospace:none;
 font-size:10.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:"Times New Roman";
 mso-fareast-theme-font:minor-fareast;}
p.MsoHeader, li.MsoHeader, div.MsoHeader
 {mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-link:"Header Char";
 margin-top:0in;
 margin-right:0in;
 margin-bottom:10.0pt;
 margin-left:0in;
 line-height:115%;
 mso-pagination:widow-orphan;
 tab-stops:center 3.25in right 6.5in;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
p.MsoFooter, li.MsoFooter, div.MsoFooter
 {mso-style-priority:99;
 mso-style-link:"Footer Char";
 margin-top:0in;
 margin-right:0in;
 margin-bottom:10.0pt;
 margin-left:0in;
 line-height:115%;
 mso-pagination:widow-orphan;
 tab-stops:center 3.25in right 6.5in;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
p.MsoCaption, li.MsoCaption, div.MsoCaption
 {mso-style-noshow:yes;
 mso-style-priority:35;
 mso-style-qformat:yes;
 mso-style-next:Normal;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:10.0pt;
 margin-left:0in;
 mso-pagination:widow-orphan;
 font-size:9.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 color:#4F81BD;
 mso-bidi-language:EN-US;
 font-weight:bold;}
p.MsoTitle, li.MsoTitle, div.MsoTitle
 {mso-style-priority:10;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-link:"Title Char";
 mso-style-next:Normal;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:15.0pt;
 margin-left:0in;
 mso-add-space:auto;
 mso-pagination:widow-orphan;
 border:none;
 mso-border-bottom-alt:solid #4F81BD 1.0pt;
 padding:0in;
 mso-padding-alt:0in 0in 4.0pt 0in;
 font-size:26.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";
 color:#17365D;
 letter-spacing:.25pt;
 mso-font-kerning:14.0pt;
 mso-bidi-language:EN-US;}
p.MsoTitleCxSpFirst, li.MsoTitleCxSpFirst, div.MsoTitleCxSpFirst
 {mso-style-priority:10;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-link:"Title Char";
 mso-style-next:Normal;
 mso-style-type:export-only;
 margin:0in;
 margin-bottom:.0001pt;
 mso-add-space:auto;
 mso-pagination:widow-orphan;
 border:none;
 mso-border-bottom-alt:solid #4F81BD 1.0pt;
 padding:0in;
 mso-padding-alt:0in 0in 4.0pt 0in;
 font-size:26.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";
 color:#17365D;
 letter-spacing:.25pt;
 mso-font-kerning:14.0pt;
 mso-bidi-language:EN-US;}
p.MsoTitleCxSpMiddle, li.MsoTitleCxSpMiddle, div.MsoTitleCxSpMiddle
 {mso-style-priority:10;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-link:"Title Char";
 mso-style-next:Normal;
 mso-style-type:export-only;
 margin:0in;
 margin-bottom:.0001pt;
 mso-add-space:auto;
 mso-pagination:widow-orphan;
 border:none;
 mso-border-bottom-alt:solid #4F81BD 1.0pt;
 padding:0in;
 mso-padding-alt:0in 0in 4.0pt 0in;
 font-size:26.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";
 color:#17365D;
 letter-spacing:.25pt;
 mso-font-kerning:14.0pt;
 mso-bidi-language:EN-US;}
p.MsoTitleCxSpLast, li.MsoTitleCxSpLast, div.MsoTitleCxSpLast
 {mso-style-priority:10;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-link:"Title Char";
 mso-style-next:Normal;
 mso-style-type:export-only;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:15.0pt;
 margin-left:0in;
 mso-add-space:auto;
 mso-pagination:widow-orphan;
 border:none;
 mso-border-bottom-alt:solid #4F81BD 1.0pt;
 padding:0in;
 mso-padding-alt:0in 0in 4.0pt 0in;
 font-size:26.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";
 color:#17365D;
 letter-spacing:.25pt;
 mso-font-kerning:14.0pt;
 mso-bidi-language:EN-US;}
p.MsoSubtitle, li.MsoSubtitle, div.MsoSubtitle
 {mso-style-priority:11;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-link:"Subtitle Char";
 mso-style-next:Normal;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:10.0pt;
 margin-left:0in;
 line-height:115%;
 mso-pagination:widow-orphan;
 font-size:12.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;
 letter-spacing:.75pt;
 mso-bidi-language:EN-US;
 font-style:italic;}
p.MsoAcetate, li.MsoAcetate, div.MsoAcetate
 {mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-link:"Balloon Text Char";
 margin:0in;
 margin-bottom:.0001pt;
 mso-pagination:widow-orphan;
 font-size:8.0pt;
 font-family:"Tahoma","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
p.MsoNoSpacing, li.MsoNoSpacing, div.MsoNoSpacing
 {mso-style-priority:1;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-parent:"";
 margin:0in;
 margin-bottom:.0001pt;
 mso-pagination:widow-orphan;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
p.MsoListParagraph, li.MsoListParagraph, div.MsoListParagraph
 {mso-style-priority:34;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:10.0pt;
 margin-left:.5in;
 mso-add-space:auto;
 line-height:115%;
 mso-pagination:widow-orphan;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
p.MsoListParagraphCxSpFirst, li.MsoListParagraphCxSpFirst, div.MsoListParagraphCxSpFirst
 {mso-style-priority:34;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-type:export-only;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:0in;
 margin-left:.5in;
 margin-bottom:.0001pt;
 mso-add-space:auto;
 line-height:115%;
 mso-pagination:widow-orphan;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
p.MsoListParagraphCxSpMiddle, li.MsoListParagraphCxSpMiddle, div.MsoListParagraphCxSpMiddle
 {mso-style-priority:34;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-type:export-only;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:0in;
 margin-left:.5in;
 margin-bottom:.0001pt;
 mso-add-space:auto;
 line-height:115%;
 mso-pagination:widow-orphan;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
p.MsoListParagraphCxSpLast, li.MsoListParagraphCxSpLast, div.MsoListParagraphCxSpLast
 {mso-style-priority:34;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-type:export-only;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:10.0pt;
 margin-left:.5in;
 mso-add-space:auto;
 line-height:115%;
 mso-pagination:widow-orphan;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
p.MsoQuote, li.MsoQuote, div.MsoQuote
 {mso-style-priority:29;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-link:"Quote Char";
 mso-style-next:Normal;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:10.0pt;
 margin-left:0in;
 line-height:115%;
 mso-pagination:widow-orphan;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 color:black;
 mso-bidi-language:EN-US;
 font-style:italic;}
p.MsoIntenseQuote, li.MsoIntenseQuote, div.MsoIntenseQuote
 {mso-style-priority:30;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-link:"Intense Quote Char";
 mso-style-next:Normal;
 margin-top:10.0pt;
 margin-right:.65in;
 margin-bottom:14.0pt;
 margin-left:.65in;
 line-height:115%;
 mso-pagination:widow-orphan;
 border:none;
 mso-border-bottom-alt:solid #4F81BD .5pt;
 padding:0in;
 mso-padding-alt:0in 0in 4.0pt 0in;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 color:#4F81BD;
 mso-bidi-language:EN-US;
 font-weight:bold;
 font-style:italic;}
span.MsoSubtleEmphasis
 {mso-style-priority:19;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 color:gray;
 font-style:italic;}
span.MsoIntenseEmphasis
 {mso-style-priority:21;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 color:#4F81BD;
 font-weight:bold;
 font-style:italic;}
span.MsoSubtleReference
 {mso-style-priority:31;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 font-variant:small-caps;
 color:#C0504D;
 text-decoration:underline;
 text-underline:single;}
span.MsoIntenseReference
 {mso-style-priority:32;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 font-variant:small-caps;
 color:#C0504D;
 letter-spacing:.25pt;
 font-weight:bold;
 text-decoration:underline;
 text-underline:single;}
span.MsoBookTitle
 {mso-style-priority:33;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 font-variant:small-caps;
 letter-spacing:.25pt;
 font-weight:bold;}
p.MsoTocHeading, li.MsoTocHeading, div.MsoTocHeading
 {mso-style-noshow:yes;
 mso-style-priority:39;
 mso-style-qformat:yes;
 mso-style-parent:"Heading 1";
 mso-style-next:Normal;
 margin-top:24.0pt;
 margin-right:0in;
 margin-bottom:0in;
 margin-left:0in;
 margin-bottom:.0001pt;
 line-height:115%;
 mso-pagination:widow-orphan lines-together;
 page-break-after:avoid;
 font-size:14.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";
 color:#365F91;
 mso-bidi-language:EN-US;
 font-weight:bold;}
span.Heading1Char
 {mso-style-name:"Heading 1 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 1";
 mso-ansi-font-size:14.0pt;
 mso-bidi-font-size:14.0pt;
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#365F91;
 font-weight:bold;}
span.Heading2Char
 {mso-style-name:"Heading 2 Char";
 mso-style-noshow:yes;
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 2";
 mso-ansi-font-size:13.0pt;
 mso-bidi-font-size:13.0pt;
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;
 font-weight:bold;}
span.Heading3Char
 {mso-style-name:"Heading 3 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 3";
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;
 font-weight:bold;}
span.Heading4Char
 {mso-style-name:"Heading 4 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 4";
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;
 font-weight:bold;
 font-style:italic;}
span.Heading5Char
 {mso-style-name:"Heading 5 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 5";
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#243F60;}
span.Heading6Char
 {mso-style-name:"Heading 6 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 6";
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#243F60;
 font-style:italic;}
span.Heading7Char
 {mso-style-name:"Heading 7 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 7";
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#404040;
 font-style:italic;}
span.Heading8Char
 {mso-style-name:"Heading 8 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 8";
 mso-ansi-font-size:10.0pt;
 mso-bidi-font-size:10.0pt;
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;}
span.Heading9Char
 {mso-style-name:"Heading 9 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 9";
 mso-ansi-font-size:10.0pt;
 mso-bidi-font-size:10.0pt;
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#404040;
 font-style:italic;}
span.TitleChar
 {mso-style-name:"Title Char";
 mso-style-priority:10;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Title;
 mso-ansi-font-size:26.0pt;
 mso-bidi-font-size:26.0pt;
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#17365D;
 letter-spacing:.25pt;
 mso-font-kerning:14.0pt;}
span.SubtitleChar
 {mso-style-name:"Subtitle Char";
 mso-style-priority:11;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Subtitle;
 mso-ansi-font-size:12.0pt;
 mso-bidi-font-size:12.0pt;
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;
 letter-spacing:.75pt;
 font-style:italic;}
span.QuoteChar
 {mso-style-name:"Quote Char";
 mso-style-priority:29;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Quote;
 color:black;
 font-style:italic;}
span.IntenseQuoteChar
 {mso-style-name:"Intense Quote Char";
 mso-style-priority:30;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Intense Quote";
 color:#4F81BD;
 font-weight:bold;
 font-style:italic;}
p.NewDocument, li.NewDocument, div.NewDocument
 {mso-style-name:"New Document";
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-next:Normal;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:10.0pt;
 margin-left:0in;
 line-height:115%;
 mso-pagination:widow-orphan;
 font-size:12.0pt;
 mso-bidi-font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
span.BalloonTextChar
 {mso-style-name:"Balloon Text Char";
 mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Balloon Text";
 mso-ansi-font-size:8.0pt;
 mso-bidi-font-size:8.0pt;
 font-family:"Tahoma","sans-serif";
 mso-ascii-font-family:Tahoma;
 mso-hansi-font-family:Tahoma;
 mso-bidi-font-family:Tahoma;
 mso-bidi-language:EN-US;}
span.HeaderChar
 {mso-style-name:"Header Char";
 mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Header;
 mso-ansi-font-size:11.0pt;
 mso-bidi-font-size:11.0pt;
 mso-bidi-language:EN-US;}
span.FooterChar
 {mso-style-name:"Footer Char";
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Footer;
 mso-ansi-font-size:11.0pt;
 mso-bidi-font-size:11.0pt;
 mso-bidi-language:EN-US;}
span.FootnoteTextChar
 {mso-style-name:"Footnote Text Char";
 mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Footnote Text";
 font-family:"Times New Roman","serif";
 mso-fareast-font-family:"Times New Roman";
 mso-fareast-theme-font:minor-fareast;}
span.SpellE
 {mso-style-name:"";
 mso-spl-e:yes;}
span.GramE
 {mso-style-name:"";
 mso-gram-e:yes;}
.MsoChpDefault
 {mso-style-type:export-only;
 mso-default-props:yes;
 font-size:10.0pt;
 mso-ansi-font-size:10.0pt;
 mso-bidi-font-size:10.0pt;
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:Arial;
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:Arial;}
 /* Page Definitions */
 @page
 {mso-footnote-separator:url("07-09-0222.cv%20opinion_files/header.htm") fs;
 mso-footnote-continuation-separator:url("07-09-0222.cv%20opinion_files/header.htm") fcs;
 mso-endnote-separator:url("07-09-0222.cv%20opinion_files/header.htm") es;
 mso-endnote-continuation-separator:url("07-09-0222.cv%20opinion_files/header.htm") ecs;}
@page Section1
 {size:8.5in 11.0in;
 margin:1.0in 1.0in 1.0in 1.0in;
 mso-header-margin:.5in;
 mso-footer-margin:.5in;
 mso-page-numbers:1;
 mso-title-page:yes;
 mso-footer:url("07-09-0222.cv%20opinion_files/header.htm") f1;
 mso-paper-source:0;}
div.Section1
 {page:Section1;}
@page Section2
 {size:8.5in 11.0in;
 margin:1.0in 1.0in 1.0in 1.0in;
 mso-header-margin:.5in;
 mso-footer-margin:.5in;
 mso-title-page:yes;
 mso-footer:url("07-09-0222.cv%20opinion_files/header.htm") f2;
 mso-paper-source:0;}
div.Section2
 {page:Section2;}
-->








NO. 07-09-00222-CV

 

IN THE COURT OF APPEALS

 

FOR THE
SEVENTH DISTRICT OF TEXAS

 

AT
AMARILLO

 

PANEL A

 

 MARCH 12, 2010



 



 

THE STATE OF TEXAS, APPELLANT

 

v.

 

CHAPMAN CHILDREN'S TRUST I, APPELLEE 



 



 

 FROM THE COUNTY COURT AT LAW NO 1
OF POTTER COUNTY;

 

NO. 81,106-1; HONORABLE W. F. (CORKY) ROBERTS, JUDGE



 



 

Before CAMPBELL
and HANCOCK and PIRTLE, JJ.

 

 

MEMORANDUM OPINION

 

Appellee,
the Chapman Children=s Trust I, filed a motion to enforce an agreed
judgment affecting it and appellant the State of Texas.  The State filed a plea to the jurisdiction
which the trial court denied.  The State
now brings this interlocutory appeal challenging the trial court=s order.  We will affirm.   

Background

On November 16, 2000, the trial court
signed an agreed judgment in a condemnation proceeding brought by the State
against the Trust, in which the State acquired land for construction of a part
of Loop Highway 335 near Amarillo.  The
agreed judgment determined the compensation to be paid by the State, and
addressed future construction events. 
Among other things, the judgment provided: 

[The Trust] will give all necessary right-of-way for one way frontage
roads, turnaround under the BNSF Railway Bridge and future Coulter Street
interchange with Loop Highway 335, each to be built by TxDOT,
at [the State's] costs, in the area agreed to by George Chapman and TxDOT as needed.

The Trusts
motion to clarify and enforce the agreed judgment, filed in the same cause, alleged the agreed judgment obligated the State to Ainstall
an overpass with one-way frontage roads at the then future Coulter Street
interchange with Loop Highway 355.@  The motion sought an
order declaring these improvements had become Aneeded@ and compelling the State to Aimmediately@ undertake construction.  The State filed a plea to the jurisdiction
which was denied.  It challenges this
ruling by interlocutory appeal.  See
Tex. Civ. Prac. & Rem. Code Ann. ' 51.014(a)(8)
(Vernon 2008).[1]

Analysis

Through a single issue the State
contends the trial court is without jurisdiction to consider the Trust=s motion.  It argues the motion is an attempt by the
Trust to obtain relief beyond the scope of the agreed judgment and the motion contravenes the State=s sovereign immunity from
suit.

A plea to the
jurisdiction is a dilatory plea that seeks dismissal of a case for lack of
subject-matter jurisdiction.  Harris County v. Sykes, 136 S.W.3d 635, 638 (Tex. 2004).  Whether the trial court lacks subject-matter
jurisdiction is a question of law we review de novo.  State v. Holland, 221
S.W.3d 639, 642 (Tex. 2007).  A
plea to the jurisdiction may be presented as either an attack on the
sufficiency of the pleadings, as the State does here, or an evidentiary attack
on the existence of jurisdictional facts. 
See Texas Dept of Parks & Wildlife v. Miranda, 133 S.W.3d 217, 226-27 (Tex. 2004).  We liberally construe the plaintiff=s petition,
looking to the pleader=s intent. 
Holland, 221 S.W.3d at 642-43.  

The Trusts underlying motion to
clarify and enforce is its second effort to enforce the 2000 agreed
judgment.  In 2007, the Trust filed a
similar motion, which the trial court granted in July of that year.  On the State=s appeal, we vacated the 2007 order, finding it included a
requirement not contained in the agreed judgment.  We applied case law holding that an enforcement
order may not be inconsistent with the judgment enforced and must not
constitute a material change in substantial adjudicated portions of the
judgment.[2]  See State v. Chapman
Children=s Trust I, No. 07-08-0050-CV, 2008 WL 4508767 (Tex.App.BAmarillo Oct. 8,
2008, no pet.) (mem. op.).

In its current appeal, the State
contends that Chapmans 2009 motion also seeks relief beyond that permitted in
an enforcement order.  It argues the
trial court cannot grant the relief the Trust seeks without making a substantial
change in the agreed judgment or adding obligations to it.  Thus, the State concludes, the trial court
lacks jurisdiction to consider the motion. 
In support, the State cites First Alief Bank v. White, 682 S.W.2d 251 (Tex. 1984) (orig.
proceeding, per curiam) and Kenseth v. Dallas County, 126 S.W.3d 584 (Tex.App.Dallas
2004, pet. denied).  Neither case
supports the States contention.  In both
cases, the appellate courts found orders entered by the trial courts exceeded
their authority, but those determinations were made after the orders were
entered.  First Alief Bank,
682 S.W.2d at 251, 252 (mandamus review of order); Kenseth, 126 S.W.3d at 599-600 (review on appeal of orders signed outside
plenary power).  A trial court has
both inherent and rule-given power to enforce its judgments.  See Tex. R. Civ. P. 308; Arndt v.
Farris, 633 S.W.2d 497, 499 (Tex. 1982) (orig. proceeding) (inherent
enforcement power).  If the trial court here enters an
order on the Trusts motion that exceeds the courts authority, the error can
be corrected on appeal, as occurred with the 2007 order.

With respect to the States
contention sovereign immunity deprives the trial court of jurisdiction to
consider the Trusts motion to clarify and enforce the agreed judgment,[3]
we find guidance in the supreme court=s plurality
opinion in Texas A
& M UniversityBKingsville v. Lawson, 87 S.W.3d 518 (Tex. 2002).  Lawson, a faculty member, sued the university
alleging, among other things, violations of the Whistleblower Act.[4]  Id. at 518-19.  The parties reached a settlement.  Lawson released his claim and the case was
dismissed with prejudice.  Id. at 519. 
Later, Lawson sued the university alleging breach of the settlement
agreement.  The university filed a plea
to the jurisdiction claiming sovereign immunity.  Id. 
It was denied and the order affirmed by the court of appeals.  

On the university=s petition for review, the supreme court noted:

[W]hen a governmental entity is exposed to suit because of a waiver of immunity, it cannot nullify that waiver by settling the
claim with an agreement on which it cannot be sued.  The government cannot recover waived immunity
by settling without defeating the purpose of the waiver in the first place. 

Lawson, 87 S.W.3d at 521. 
It accordingly held, A[H]aving
waived immunity from suit in the Whistleblower Act, the State may not now claim
immunity from a suit brought to enforce a settlement agreement reached to
dispose of a claim brought under that Act.@  Id.
at 522-23.  To hold otherwise, Awould limit settlement agreements
with the government to those fully performed before dismissal of the lawsuit
because any executory provision could not thereafter
be enforced.@  Id. at 521.

Here, the agreed
judgment settled a suit in condemnation brought by the State against the
Trust.  Article 1, section 17 of the
Texas Constitution requires the condemnor in an
eminent domain action make adequate compensation for the property taken.[5]  The Fort Worth Court of Appeals applied Lawson to the settlement of an eminent
domain proceeding, holding a city was not immune from a subsequent action for
breach of the settlement agreement.  City of
Carrollton v. Singer, 232 S.W.3d 790, 800 (Tex.App.BFort Worth 2007,
pet. denied).  We also find
the Lawson opinion provides a
sufficient answer to the States contention its agreed judgment settling its
condemnation proceeding against the Trust cannot be judicially clarified or
enforced because of sovereign immunity.[6]

The State makes other arguments in
support of its sovereign immunity claim, including a contention the agreed
judgment is so indefinite as to be unenforceable as a
contract. But A[i]mmunity from suit does not turn on the validity of the
settlement agreement sued on.@  Lawson, 87 S.W.3d at
523.  As a dilatory plea, a plea
to the jurisdiction should be decided without delving into the merits of the
case.[7]  Bland Ind. Sch. Dist. v. Blue, 34 S.W.3d 547, 554 (Tex. 2000).   Moreover, none of the States additional
arguments convince us our application of Lawson
here is mistaken.

We find the trial court did not err
in overruling the State=s plea to the jurisdiction on this
ground, and so overrule the States sole issue. 

Conclusion

The trial courts
order denying the State=s plea to the jurisdiction is affirmed.

 

                                                                                                James
T. Campbell                                                                                                                                     Justice

 

 

 

            








 











[1]  Hearing of the motion and all other trial court proceedings are stayed
pending resolution of the appeal.  Tex. Civ. Prac. &
Rem. Code Ann. ' 51.014(b) (Vernon 2008).





[2]
See Harris
County Appraisal Dist. v. West,
708 S.W.2d 893, 896 (Tex.App.--Houston [14th Dist.]
1986, orig. proceeding) (citing Various
Opportunities, Inc. v. Sullivan Investments, Inc., 677 S.W.2d 115, 118 (Tex.App.--Dallas
1984, no writ).  We cited also Bank
One, N.A. v. Wohlfahrt, 193 S.W.3d 190, 194-95 (Tex.App.--Houston [1st Dist.] 2006, no pet.) for the proposition that a
post-judgment enforcement order may not add obligations to those required by
the judgment.





[3]
Because
immunity from suit affects the court=s jurisdiction, it
is properly raised in a plea to the jurisdiction.  Wichita Falls State
Hosp. v. Taylor, 106 S.W.3d 692, 696 (Tex. 2003).  

 





[4]  Tex. Gov=t Code Ann. ' 554.001-.010 (Vernon 2004).





[5]
In pertinent part, Article 1,
section 17 of the Texas Constitution provides that A[n]o person=s property shall be taken, damaged or
destroyed for or applied to public use without adequate compensation being made
. . . .@ 
Tex. Const. Art. I, ' 17.





[6] That the Trust seeks clarification or enforcement of
the agreed judgment in the same cause, rather than in a later-filed separate
suit for breach as in Lawson, 87
S.W.3d at 523, and Singer, 232 S.W.3d
at 794, further weakens the States sovereign immunity claim. 

 





[7] Accordingly, we do not consider, and express no
opinion on, the correctness of the Trusts contentions regarding the meaning of
the language of the agreed judgment.